May it please the Court, a concerted refusal to sell essential raw material to a competitor is a quintessential antitrust violation. Here, AK Steel and US Steel swore under penalty of prosecution to the Commerce Department that they had the ability and an enormous incentive to sell steel slab to JSW at the precise thickness and chemical specifications that JSW required. But when JSW ordered the steel, AK Steel and US Steel executed an inexplicable about-face. They refused to sell the specified product and offered only unusable slab that differed from JSW's exacting specifications in both thickness and chemistry. The question before the Court is whether it's at least plausible that AK Steel and US Steel acted pursuant to an unlawful agreement when they abruptly refused to sell millions of dollars of slab that they had previously pledged a desire to sell. Because the answer to that question is yes, this Court should reverse. I'd like to begin with a few factual allegations that highlight why this refusal was at least plausibly the result of an agreement rather than independent business judgment. First of all, on page 1021 of the record in our complaint, JSW pleads in great detail that it provides a very detailed list of specifications that are essential for its steel slab to be able to be used to serve its end customers with safe, finished products for the use in bridges, pipelines and ships and other high-pressure applications. To quote from page 1021, JSW gives slab producers extremely precise specifications and JSW cannot accept variance from those specifications without risking the integrity of the product. JSW went to the Department of Commerce and said if it could not get those precise slabs to those specifications in the United States, then it would need to go to India. In their response, in their commerce objections, AK Steel and US Steel swore that they had the ability to provide those precise slabs and they said they had, quote, an enormous incentive to provide them in eight weeks. In fact, US Steel said at page 1038 of the record that it, quote, produces the entire spectrum of grades and dimensions identified in JSW's request. To sum that up, in other words, AK Steel and US Steel said it was in their best interest to sell and they were planning to sell. But when JSW came and they ordered 10-inch and 12-inch slabs with those same chemical and dimensional requirements, AK Steel and US Steel offered only different products at different times that they knew were unusable to JSW. Let me just spell that out just a bit here. AK Steel said, we cannot provide you 10- to 12-inch slabs as we said we could. We can provide you 8- to 9-inch slabs, completely unusable to JSW, we've pleaded. US Steel says, we can supply you 10-inch slabs, but only in 18 months, obviously completely unusable, very different from the eight weeks that they said. And they also said, US Steel also said, for 10- and 12-inch slabs, even if we can get them to you, they will have to meet this one page long list of deviations with respect to the chemistry that was essential to JSW. Now there's no apparent reason for two ostensibly competing suppliers, like AK Steel and US Steel, to refuse to sell millions of dollars of products that they previously said they desired to sell. In an ordinarily functioning market, one would not want to lose the sale to the other competitor. Thus, we have alleged that it's at least plausible that they refused to sell this product pursuant to an agreement, because one knew that the other one also would not go through with the sale. And that's because they wanted to deprive JSW, which was a competitor of both of them, of the essential raw materials that they needed to compete in the market, and to force JSW into the higher-priced, tariff-laden foreign market. Now we've explained on pages 31 to 32 of our brief, and reply brief at 9, that offering a different and unusable product, or offering to sell in commercially unreasonable terms, is a refusal to deal, or at the very least, a practical refusal to deal. Now the district court faulted JSW for, quote, walking away from the negotiating table. At the very least, that was an improper, factual resolution at the motion-to-dismiss stage, where the complaint needs to be taken as true. And how do we know that? Well, first of all, JSW didn't just approach AK Steel and US Steel out of the blue with this unusual offer. Imagine that scenario, sure, if somebody had come back with a little bit of deviations and said, no, we can't make that bespoke product, sure, then it might have been unreasonable for JSW to walk away. But we approached AK Steel and US Steel only after they swore to make these precise products. In that context, when AK Steel and US Steel come back with an offer to sell something in 18 months, or something that's just completely different, that they know is unusable, that is not good faith negotiations. And just to remind the court, as I mentioned earlier, AK Steel and US Steel was not just offering minor deviations here. They were saying, we'll get you something in 18 months. They were saying, we can't sell you 10 to 12-inch steel at all. We'll sell you 8 to 9-inch thick slab. And this type of response to an offer in this context, that ends the discussion. That's a refusal to deal. Imagine if you will. But just back to plausibility, the district court discerned that you or your client did not allege sufficient facts, I guess, to establish the plausibility. Did you get a sense of what the trial court, what additional facts were missing, or that you might have played that you didn't play? It's hard to say, Your Honor. I think the court tried to look through the complaint and did not take into account the fact that AK Steel and US Steel had already sworn to provide these precise products. So the court said, we should have kept negotiating. We should have pushed them to correct their deviations. And I think he also talked about the credit requirement, which I'm going to talk about in a second. But I think an illustration might help show why this was not a case where we were supposed to keep negotiating. At least, it was plausibly a refusal to deal. Just imagine a cardiologist at a hospital that needs a very complicated heart drug with many ingredients to prescribe to its patients. It goes to its two wholesalers. They say, we can get you that drug with those precise ingredients within eight weeks. Then the cardiologist orders the drug. Now those two wholesalers say, well, we could get it to you in 18 months, and it might have a few different ingredients that won't really treat cardiac patients anymore. Well, that doctor's not going to say, let's keep negotiating. That's a refusal to deal at that point, at least plausibly. Now let me talk about what I think also led the district court astray here, which is the demand for confidential financial statements in order to establish credit for my client. They might have had a point if AK Steele and US Steel said, we'll sell you your precise products that we pledged to sell if you hand over your confidential financial statements. But that's not what they said. They said, we won't sell you the precise products that we pledged to sell and that you want. And even to get the products that you don't want, you have to hand over your confidential financial statements. How important is the credit worthiness piece? It does seem to me that you still got the rest of your factual basis from these two competitors when they would not provide you the right products. It seems like credit worthiness is sort of an aside. We agree, Your Honor. The core and all that's necessary to plead refusal to deal here is that they came forward and refused to sell the products that they had previously pledged to sell. We have pleaded that the request for audited financial statements was additional evidence of pretext. But to answer Judge Stewart's question, that is what I think led the district court astray to say, well, of course, it's okay to establish the credit of your customers. Now . . . How substantial? I mean, one of the things maybe in your brief, I was just thinking about it, the parent of this company, I don't know what the relationship is, but is it an India-based parent company which is a very substantial player in this industry? Yes. The parent company is a . . . Or is there at least . . . Do you plead that at all, that it's not plausible that these companies would want a credit worthiness statement from somebody with that relationship? We pleaded that it was pretext, and the facts that support why it is pretext is because at page 1011 and 1012 in the complaint, we talk about JSW as a subsidiary of an Indian company. It happens to be a $14 billion company, and that these companies were aware that JSW was planning a multi-hundred million dollar expansion in the U.S. So they were aware that this was a substantial company, and if you look at the way these discussions played out at pages 1042 to 44 in the complaint, it confirms your suspicion that the refusal to deal was really already in place, because what happened there is both AK and U.S. Steel, initial response was, you need to hand over confidential financial statements to your competitor. They knew that JSW was not going to do that, but that did not end the discussion. Seven to ten days later, after they made that unusual demand, then they sent over their or that they would only sell us eight to nine inch steel instead of ten inch steel. So that's what ended the discussion. That's what the complaint reflects, and that's why we say it's additional evidence of pretext on top of what we have already pleaded with respect to the core refusal to deal. Now let me talk a minute, well, let me close on that point with another question for the panel. Why would JSW walk away from the negotiations in some unreasonable way at that point, if there was any chance they could have ultimately got these products? That just put them into the tariff burdened foreign market and caused them these millions of dollars of damages that they later incurred. If there was any chance, believe me, they would have tried to keep negotiating. That's why it's at least plausible that they knew that AK and U.S. were freezing them out and refusing to sell them a product. So this really has gone to the against self-interest plus factor pleading, which in itself is sufficient to nudge our complaint across the line from conceivability to plausibility. But we've also pleaded that this refusal to deal came on the heels of many meetings between these companies, that there was a motive to conspire, and that this market is highly concentrated and conducive to conspiracy as well. Let me stay a minute or two on Norr Pennington, because that, again, back to Judge Stewart's question, I think that's what really also led the district court astray. The district court actually said that this entire case is barred by Norr Pennington, and that cannot possibly be right, because we are not claiming that the statements to commerce are the actionable antitrust violation. We are claiming that the later refusal to sell these products is the actionable antitrust violation. And Norr Pennington does not, Norr Pennington just immunizes the petitioning conduct. It doesn't say you can't use the petitioning conduct to show the purpose and the character of the actionable conduct. And this court has said precisely that already in Feminist Women's Health Center v. Muhammad footnote 7, which we cite in our brief. The court said, evidence of activity protected by the Norr Pennington doctrine may be admitted to show the purpose and character of non-protected activity, if doing so is not overly prejudicial to the defendants. You have any circuit level case that actually does that? There's argument by your friend on the other side that you're misreading what those other purposes are that this evidence can be used for. What is your best case that actually does what you want us to do, which is to include this information as part of the case? So Feminist Women's Health Center would have admitted the evidence, but for the fact that it was not very probative. Our evidence is extremely probative. It places into context the later refusal to deal by showing that they had pledged that they had the ability and an enormous incentive to sell it. So it casts that actionable conduct in a highly questionable light. So it's highly probative. It's not unduly prejudicial. There was nothing wrong with what they were doing with the Department of Commerce. If they were telling the truth and they had followed through on their steel slab sales to us, that would not be prejudicial. And certainly that sort of weighing is not proper at the motion to dismiss stage. I don't think we have a circuit case beyond that. We have a district court case. That's what I took your answer to mean. That's what I took your answer to mean when you said that. Right. Right. Yeah. But I think the clear implication of Feminist Women's Center is this could be admitted if it were probative. And just think about, I come back to sort of basic First Amendment principles. Wisconsin versus Mitchell in the Supreme Court in other cases say that, for example, just to take a hypothetical, imagine somebody on Facebook extolling the virtues of using heroin. Perfectly protected by the First Amendment, could not be charged with that. But if a criminal case arises and the question in the case is whether that person intentionally possessed heroin that was found in his car or was put there by somebody else, of course the prosecution can introduce the First Amendment protected activity to show intent and purpose and character of their later actions. That's all that we are asking the court to do here. Once you consider that evidence, it's clearly a plausible pleading that this could have resulted from an agreement. All right.  You've preserved your rebuttal. All right. We'll hear from Mr. Pincus for U.S. Steel. Good morning, Your Honor. May it please the court. I want to start, Judge Stewart, with your question about whether there was a refusal to deal here because we think the case was properly disposed of on that grounds, that there's no plausible basis for an inference that there was a refusal to deal. What the complaint alleges is that JSW started negotiations and then got a counteroffer and then stopped. And we think that doesn't support a plausible inference of a refusal to deal because it's ordinary in business negotiations that there are offers and counteroffers. Well, you know what Mr. Streets has already said about that. What's your response? That it had already been to the Commerce Department or wherever these assertions were made, the requirements to them, and then the representation that you're talking about now says you can't or at least you don't start there. So is there another way to look at the facts or why would you need to negotiate if there's already been an assertion by these companies they could provide these precise requirements? Well, I think the critical point on those representations is the representations to the government were that they could do this, not that they were the company's preferred terms. They said, yes, we can do this. And so there's nothing in those submissions that barred the companies from saying we'll try to get more favorable terms and if the deal goes where it does, if we can't get those favorable terms, we'll go back to what we said. We're looking at plausibility. What I see this as is an extraordinarily, I don't know what your business is, your client's business is and whether this is a big contract or not, but it sounds like a lot of money to me and that's what this company, JSW, was looking for. And after already certifying, I don't know what the word is, but already assuring governmental parties that you could provide these precise steel requirements, then when you're asked to sell them to somebody for a fair amount of money, you don't start there. And to me, you're looking at plausibility, not probability. That's for later. That it's plausible something else is going on here. I think the reason it's not plausible or a key reason is the complaint, two facts. One, of course, those representations were made in April 2018 when the tariffs were just taken in effect. This request came a year later after the tariffs had been in effect. So the company's situation in terms of their capacity, in terms of their ability to provide was obviously very different once the tariffs had taken effect and the complaint shows that because paragraphs 22 to 24 of Record on Appeal 1015 talk about how 2018 and 2019 were record years for this company. So Mr. Street says the companies had the incentive. The incentive was quite different then and I think it's quite implausible based on those facts that are alleged in the complaint to say that these companies were in the same position that they were when they made those representations. So I think that's a critical difference and I think that's something that dramatically affects plausibility in addition to the fact that the court obviously can bring its common sense to bear on that plausibility question. And on the specifications, there too, with respect to U.S. Steel, the complaint specifically characterizes the changes to the chemical composition as requested specifications. They made a request. JSW never came back and said, no, actually we have to insist on what we first asked for. If that had happened, this would be a very different case and I think the cases my friend relies on for practical refusal to deal, cases like DocMagic and Sumotext are cases where there is this back and forth and it becomes apparent, at least plausible, that based on that back and forth, the seller was not going to deliver what the buyer asked for. But here, we never had a response on the specification part or the timing part. And on the creditworthiness part, there was a response but it wasn't what was asked for. So I think those are critical differences here that make the district court's conclusion that the existence of a refusal to deal was implausible and also the separate conclusion that if there was a refusal to deal, it was against interest. Because that question obviously depends entirely on whether there was a contradiction between what the companies represented to the Commerce Department and what they stated in the negotiations. And as I said, on the timing, first of all, U.S. Steel did not represent anything to the Commerce Department with respect to timing. ROA 384 shows that they said that information was confidential and was going to provide it confidentially. So it was available to the Commerce Department but not something that JSW could rely on. Was there some representation by one of the other companies on how quickly this deal could be provided? AK Steel had a representation about how quickly it could be provided. But again, that was a representation in April 2018 at the very beginning of this process. I don't think the question here really is, are the responses a year later? So is it implausible or is it plausible to say that they were against legitimate business interest because of what was represented a year earlier? And I think particularly with respect to the timing, that's an implausible conclusion given the dramatic change that had occurred in the industry over that year, especially with respect to the available capacity of American producers, which the complaint itself alleges. There's a lot to infer or for the court to read into the complaint when you're looking at its sufficiency on plausibility. For the court to take into account, even if it's stated in the complaint itself, changes that have occurred. It seems to me we're getting an awful lot closer into fact determination rather than just is the complaint itself on its face. Reading it with an understanding to take those facts as true. They were supposed to apply all these other considerations. Is there any particular case law you can cite to me that even the plausibility of it, if he had filed this complaint a year earlier, it's no longer plausible now? Is the court really supposed to be factoring all that in? I think Twombly does exactly that, Your Honor. What the Supreme Court did in that case, that was the case about whether there was concerted action by the local phone companies to not enter each other's markets. And the court looked at other allegations of the complaint to explain why that conduct was actually in the complaint. But it had to be in the complaint. Yes. When Twombly was looking at it, it was in the complaint. And you said the time difference is shown in the complaint. The industry, I guess, direction in the past year is shown in the complaint. So that's what you're saying we need to be applying? I think the time difference is shown in the complaint. The tariffs took effect during that period. I think that's alleged in the complaint. The complaint alleges the dramatic improvement in the company's business over that period, very different from what it was in 2018 compared to 2019. And of course, Iqbal says that courts are supposed to bring their understanding of the world. And I think when you put all those things together, it's just not plausible to say, certainly with respect to the statements about timing for delivery, that there was some contradiction between what was responded to JSW and the commerce filings that gives rise to a plausible inference that those statements were against interest, especially with respect to U.S. Steel, as I say, because there was no public representation about timing that it could rely on. And then I think you turn to the specification differences. And again, the allegation there is that U.S. Steel, quote, requested deviations. And I think the mere fact of a request, given that the commerce department representation was just that this was possible, not that this was something that was the company's preferred sale, just saying that a buyer made a request, the seller made a counteroffer, it's implausible to say from those two facts the seller was refusing to deal, given the negotiations, and that offers and counteroffers are normal in business negotiations. Again, as I say, if JSW has alleged, no, we came back and said we've got to have that, and either the other company didn't respond or said no, that would be a very different situation. But just based on one counteroffer, that just seems implausible given the greater context of the business world. And I think with respect to the creditworthiness issue that Your Honor asked about, there, too, there was a request. The sellers didn't know the relationships between the subsidiary and its parent. They had no way to know whether the parent was going to be on the hook. So perfectly legitimate in the business context, again, bringing a court's knowledge of the world to bear, as Iqbal says, to say we'd like some creditworthiness information. JSW said we won't provide that. There was a back and forth with AK in which JSW several times refused to provide the different things that AK requested, and there was never a comeback with respect to U.S. Steel's request. So there, too, whether that shows that there wasn't a refusal to deal or that there was a legitimate self-interested reason not to deal, we think for both of those reasons the district court reached a plausible result. We have two other reasons that I'd like to address as well. One is, is there a plausible inference that this was contrary to the defendant's economic interest, which obviously is critical to satisfy the Twombly standard, that it's more plausible that this was concerted action than not? Here, I think stepping back, that inference only makes sense if the alleged concerted action is something that wasn't going to be effective in the absence of other companies taking the same action. And there's no allegation of that here. Again, it's ordinary in the world for companies to turn down additional work. They can have all kinds of reasons, including just we don't have capacity or what you're requesting, given the business that we already have, is going to be too costly or too burdensome. And so the question is, does the refusal to deal by itself sufficiently show something that's contrary to economic self-interest? And I think it's telling that in the cases that my friend cites that are refusal-to-deal cases, all of them rely on other plus factors. None of them rely just on the refusal to deal with an alleged illegitimate interest as the sole reason for finding the Twombly test satisfied. And we think that's because you can't really just from a refusal to deal by itself infer contrary to economic self-interest. So many of those cases, just to talk about some, Anderson News, Black & Decker, Evergreen, all have detailed allegations of actual meetings between the competitors where they hatched the plot and agreed on what to do. Pool Products was a price increase case. Essentially, the refusal to deal was a refusal to deal except on terms that would increase the buyer's costs. So obviously, price fixing is very different, because raising prices doesn't work unless you have people throughout the industry agreeing. But a refusal to deal is different, and we think that's why the cases that they rely on don't find that contrary economic self-interest factor without these additional elements. I'd like to turn to the Norr Pennington issue that Your Honor asked about. I think the critical issue here is that although cases have said, as my friend talked about, that petitioning conduct can be used to inform other conduct, all of those cases in which that's permitted are cases in which either the complaint or the jury verdict or the summary are evidence that supported a finding of concerted action. So this case really presents, I think for the first time at least, I don't think either side has found a case, the question whether petitioning conduct can be looked at in this way when it is the factor that tips the balance from implausibility to plausibility. And we think that's a critical difference. This hasn't been addressed before, but Norr's basic premise was that imposing liability for petitioning conduct was contrary to the Sherman Act. It was beyond the scope of the Sherman Act, and we think either tipping from implausibility to plausibility or upholding a jury verdict based solely on this evidence goes right at the core of Norr. I think my friend says that's contrary to the First Amendment. This is a print statutory interpretation principle. Norr and Pennington were cases that construed the Sherman Act to avoid potential constitutional questions. They didn't rely directly on the First Amendment. So it might be that in other First Amendment contexts where you're just looking at what the First Amendment prohibits, this might not be true. But we think in the Norr-Pennington context where you're talking about the scope of the Sherman Act, making this evidence the tipping point creates just what the Supreme Court cautioned against and said was prohibited in Norr and Pennington. My friend mentioned one thing about the meetings. The district court discussed the meeting evidence. Most of those meetings were in connection with the petitioning conduct, and the really only plausible interpretation is that that's what they involved. All right, counsel. Thank you. Thank you, sir. All right. Mr. Katerberg. Good morning. May it please the Court. Rob Katerberg for Nucor, the third defendant at plea in this case. I'm going to talk about why JSW's case against Nucor is particularly baseless. My friend, in his 15 minutes of argument, didn't mention Nucor once. I would hope he's not allowed to do so for the first time at rebuttal because everything that he talked about . . . He will be because you're now addressing it. Thank you, Your Honor. Everything he talked about pertains solely to the other defendants. Let's talk about Nucor for a second. Nucor never represented to the Department of Commerce that it could or would sell slab to JSW. It was never asked to sell slab to JSW. It never refused to sell slab to JSW. And so the complaint alleges that Nucor's steel mills weren't set up to sell slab externally, and they admit that that's a material distinction. So everything you've heard about practical refuse-to-deal, 10- to 12-inch slabs versus 8- to 9-inch slabs, pretext, financial statements, creditworthiness, none of that has anything to do with Nucor. Now, what JSW has said in its brief is they say not so fast because a company that doesn't itself refuse to deal with a plaintiff can still be liable for a group boycott if it coerces or persuades its suppliers or customers to refuse to deal with a plaintiff. But the problem for JSW, Your Honors, is that here that's just an abstract theory because they don't actually plead any facts that bring Nucor within that rubric. Nucor is not alleged to be a customer of U.S. Steel or AK Steel nor a supplier. There's nothing alleged about Nucor having any kind of economic leverage over them, nothing about Nucor persuading or coercing them or anyone else. The other thing JSW says in its brief is this is conspiracy law 101. Once you join a conspiracy, you're on the hook for everything that happens, all the actions that your co-conspirators do. But that begs the question of whether it's been plausibly pleaded that Nucor joined any conspiracy in the first place. That's what Twombly is all about. And surely JSW can't bootstrap from alleged overt acts of others to try to put Nucor in the conspiracy in the first place. Now, since Nucor didn't refuse to deal, all JSW has to work with to try to put Nucor into the conspiracy is these objection filings that Nucor made with the Department of Commerce. Now, these filings, I commend them to the Court's attention. They're short. They're easily readable. They're in the record at ROA 182 to 211. These are basically mini-briefs to the Department of Commerce about whether JSW should get the special exemption from paying tariffs on the slab that they wanted to import. This is quintessential Noor-Pennington petitioning, and I don't hear JSW disputing that. Now, they do say a few things about our objection filings to try to put us in a conspiracy, but all of these are make-weight. They say that these objection filings are actually parallel conduct in and of themselves, but all of the cases in the antitrust area that have inferred a conspiracy from parallel conduct, these involve market conduct. So you're talking about price-fixing, parallel refusals to deal, that sort of thing. We're not aware of any case, and they haven't cited anywhere a conspiracy was inferred under Section 1 of the Sherman Act from parallel regulatory filings. They also say that these filings were against Nucor's independent economic self-interest. That's completely wrong. Nucor is a leading domestic producer of steel that's beleaguered by unfair competition from steel that comes in from overseas, often unfairly traded, and so Nucor has a keen interest in making sure that the tariffs are rigorously enforced and there's not a lot of exemptions that are developing and making it into Swiss cheese. The exemptions JSW is trying to get here would have made the playing field unlevel, and that's why Nucor objected to them. There's no steering of business to competitors. Again, these are mini-briefs directed to an administrative agency. They're not advertising. They're not pitches to JSW about where it should take its business. JSW also says that the objection filings are suspicious because they included U.S. Steel and AK Steel confidential information. As the district court expressly found, that was a mischaracterization. They were based on public information about the collective capabilities of the domestic industry and the aggregate. The district court itemized what specifically it was relied on. Again, they're in the record. You can see them for yourself. JSW, in its brief, they repeat their line about confidential information, but they don't actually confront what the filing is saying. They don't try to engage with the district court's finding that this was indeed a mischaracterization. So, Your Honor, that's about all I have. Unless there's any questions, we'll rest on our brief for the remaining issues. We thank the court for its attention and ask that the judgment below be affirmed. All right. Thank you, sir. Back to you, Mr. Street. Thank you, Your Honor. On page 557 of Twombly, the Supreme Court said to plead a claim, quote, allegations of parallel conduct must be placed in context that raises a preceding agreement, not merely parallel conduct that could just as well be independent action. We have heard a lot of factual arguments and inferences that perhaps a jury one day could draw, but they have not remotely shown that our pleadings have not raised a suggestion of a preceding agreement, nor have my friends on the other side cited a single case where a motion to dismiss was affirmed on anything like this general scenario where companies previously pledged not only an ability but an enormous incentive to sell these precise products and then later backtracked. They say some of our cases had other plus factors, but this court in Royal Drug said in a way that is quite consistent with the Twombly quote that I just read, that the against self-interest plus factor is enough to survive a motion to dismiss. The other side has never responded to that case, either in its briefs or this morning. What you have heard, again, are fact issues, and in fact, let me focus on two of them that are new arguments that were not raised at any of the briefing up until this point. First of all, they've said the company's circumstances changed between the time that they made their representations to commerce and the time that they refused to sell. First of all, they misstate the date on which they made their representations to commerce. Those latest representations were in August 2018, not April 2018, so it was about nine months later, not a year, and that's at, I don't have the direct site. Was that August 2018, the same specific assertion? Yes. It was exactly a repetition of the same statement, and they have also said that perhaps because of changes in the steel industry during that time, that they had a capacity problem. Again, that's a new argument that has not been raised before this point, but it's important to note that when AK Steel and U.S. Steel responded to our orders, they did not say we have a capacity problem. The reason they said, AK Steel said, we can't make your product at all. We make 8 to 9-inch slabs, not 10 to 12-inch slabs, directly contrary to what they said. U.S. Steel said, we can't make it in 18 months, not because we have a capacity problem at our existing plants, but they said we would have to restart an idle plant that makes that kind of steel, that 10-inch steel. So even if you were to delve down into these fact issues, there's nothing there, but at a bare minimum, we plausibly pleaded that we speak in agreement and not just independent business conduct. By the way, one final point on that. U.S. Steel did say they could produce this within 8 weeks. I think that was perhaps inadvertently misstated by my friend. That's at ROA 1037. I'm sorry, that's at 382. 382 is their objection to our exclusion request. Can you provide this within 8 weeks? That box is checked yes. U.S. Steel. U.S. Steel. The previous site I missed before about the August 2018, that's ROA 1037. Judge Southwick, you mentioned the . . . do we have a case at the circuit level applying Norr-Pennington evidence? I forgot that we did have at Reply Brief 18 the Telecorp communications case from the Tenth Circuit where the court did exactly that and applied Norr-Pennington evidence to show purpose and character, which is itself based on footnote 3 of Norr-Pennington. Let me close with one minute on Nucor. I think I heard my friend concede that all we have to show is that Nucor is linked to this agreement and then it becomes on the hook jointly and severally liable for the refusal to deal by AK Steel and U.S. Steel. We cite an antitrust case to that effect at pages 27 to 28 of our Reply Brief and that's Hornbook conspiracy law from this court and the Supreme Court. We've adequately linked Nucor to this complaint to the refusal to deal conspiracy for at least the following reasons. First of all, Nucor actually had the most to gain by thwarting JSW's ultimate Baytown expansion that would have made JSW a direct competitor of Nucor in the market for high-end finished steel products. In fact, Nucor did gain. They opened a plant that was based on the same technological and other specs that we were going to open in Kentucky. And so they were the ones that were able to take advantage of this hot time in the steel market to build these expensive infrastructure projects. Nucor, we pleaded, was the ringleader of the conspiracy and that conspiracy began in 2018 shortly after JSW announced its Baytown extension plans. And one final point here, we heard about the Nucor response to the Department of Commerce where Nucor said AK Steel and U.S. Steel can make this product. If that's all they said, maybe that wouldn't be suspicious. But remember, here's what they said. Nucor, AK Steel and U.S. Steel can make the precise specifications that JSW has requested within eight weeks and at commercially reasonable prices. That's not something you know about your competitors. And that in and of itself shows that they have joined in an agreement, at least we have plausibly pleaded, that they were working together on something beyond just the tariffs before the Department of Commerce. All right. Thank you, Mr. Shree. Thank you to the counsel of both sides. That concludes the argument in this case. Before we take up the third case.